**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| SHAWN BURTON, | ) | |
| | ) | |
| Petitioner, | ) | Civil Action No. 2:22-cv-905 |
| | ) | |
| v. | ) | |
| | ) | Magistrate Judge Patricia L. Dodge |
| SUPERINTENDENT, SCI FOREST, | ) | |
| *et al.*, | ) | |
| | ) | |
| Respondents. | ) | |

**<u>MEMORANDUM</u>**

Before the Court[1] is the counseled Amended Petition for a Writ of Habeas Corpus (ECF 15) filed by state prisoner Shawn Burton under 28 U.S.C. § 2254. For the reasons below, the Court will dismiss with prejudice each claim raised in the Amended Petition under 28 U.S.C. § 2244(b)(4), which requires that "[a] district court shall dismiss any claim presented in a second or successive application that the court of appeals has authorized to be filed unless the applicant shows that the claim satisfies the requirements of this section." The Court also will deny a certificate of appealability as to each claim.

## I.    Relevant Background[2]

On March 9, 1993, Seth Floyd, an inmate of the Allegheny County Jail ("ACJ"), was found dead in his cell. The cause of death was determined to have been asphyxiation and the manner of death was determined to have been homicide. Following an investigation, Burton and Melvin

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c)(1), the parties voluntarily consented to have a United States Magistrate Judge conduct proceedings in this case, including entry of a final judgment.

[2] The more than thirty-year procedural history of Burton's trial, direct appeal, and subsequent state and federal collateral proceedings is lengthy and complex. The Court discusses only what is relevant to the disposition of this habeas case.

Goodwine (who were inmates along with Floyd at the ACJ) were charged with criminal homicide and criminal conspiracy.

In their respective pleadings, Burton and Respondents each provide lengthy recitations of the evidence introduced at the trial. (ECF 15 at 10-18; ECF 20 at 27-43.) The state court summarized the evidence as follows:

> On March 9, 1993, [Floyd] was found in his cell at the Allegheny County Jail on 17 Range with a shoelace tied around his neck and attached to the chain holding his bed to the wall. His official cause of death was asphyxiation.
>
> Several inmates testified that [Burton] and Goodwine were in Floyd's cell during lunch on March 9, 1993. At that time, [Burton] and Goodwine were not housed in the same range as Floyd. Specifically, Edwin Wright ("Wright") testified that on March 9, 1993 he was incarcerated in the Allegheny County Jail and housed on 17 Range. (T. p. 443). Wright testified that on March 9, 1993, he was transported to the courthouse for a hearing. (T. p. 444). When Wright returned from court, he went back to 17 Range to obtain his coffee cup. (T. p. 446). After retrieving his cup, Wright was exiting 17 Range to go to lunch and Floyd asked him a question. (T. p. 448). Wright testified that he stopped to answer his question, and observed [Burton] and Goodwine in Floyd's cell. (T. p. 450). After lunch, Wright found out that Floyd died. (T. p. 452).
>
> Micah Goodman ("Goodman") testified that he was incarcerated in the Allegheny County Jail in March 1993. (T. p. 484). Goodman testified that he was housed on the same range as Floyd and was familiar with Floyd, Goodwine, and [Burton]. (T. p. 485). He further testified that on March 9, 1993, he and Marvin Harper ("Harper") walked up to 17 Range to gamble. When they walked past Floyd's cell, they heard a scuffle. (T. pp. 487, 490). Goodman looked in and saw [Burton] and Goodwine wrestling with Floyd. (T. p. 492). Specifically, Goodman testified that he saw Floyd on his stomach on the bed, and [Burton] and Goodwine were behind him physically holding him down. (T. pp. 492-93). Goodman continued walking toward the end of the range, but did not find the person with whom he intended to gamble, so he turned around to leave 17 Range. (T. p. 495). He walked past Floyd's cell a second time and observed the three men in the same positioning. (T. p. 496).
>
> Marvin Harper testified that he was incarcerated in the Allegheny County Jail in March 1993. (T. p. 567). On March 9, 1993, Harper testified that he went to 17 Range with Goodman to play cards. (T. p. 568). As he was walking past what was later determined to be Floyd's cell, he saw two guys, later identified as [Burton] and Goodwine, wresting with Floyd. (T. p. 569). Harper testified that [Burton] had Floyd's upper body and Goodwine was holding Floyd's waist and it appeared as though Floyd was fighting back. (T. pp. 572-73). About half an hour later, Harper found out that Floyd had died in his cell. (T. p. 574).

Gregory McKinney ("McKinney") testified that he was incarcerated in the Allegheny County Jail beginning on March 16, 1993. (T. p. 607). McKinney was housed in the Disciplinary Housing Unit with [Burton] in May 1993. (T. p. 609). McKinney testified that on or about May 5, 1993, [Burton] and he were talking about Floyd's death. (T. p. 619). During this conversation, [Burton] stated that he tied a plastic bag around Floyd's neck and suffocated him. (T. p. 628). [Burton] then stated that he tied Floyd to the bunk to make it look like a suicide. (T. p. 628).

Brian O'Toole ("O'Toole") testified that he was incarcerated in the Allegheny County Jail in February 1993 and was assigned as an inmate to work in the mental health unit. (T. pp. 648-49). O'Toole was working in the mental health unit when [Burton] was housed there. (T. p. 650). During that time, [Burton] asked O'Toole to find Goodwine and tell him that [Burton] "was going to be transferred straight to the Annex and they weren't going to be able to do anything with [Floyd]." (T. p. 651). O'Toole testified that Goodwine told him to "go back and tell him to stay where he is at, not to get transferred because they had to do it." (T. p. 652).

(ECF 33-1 at 21-23.)

Burton and Goodwine's joint trial was held in September 1993. At the trial's conclusion, the jury found Burton guilty of first-degree murder and conspiracy. The jury found Goodwine guilty of conspiracy and acquitted him on the homicide charge. The trial court sentenced Burton to the mandatory term of life imprisonment on his first-degree murder conviction. Goodwine was sentenced to 5-10 years' imprisonment on his conspiracy conviction.

The Superior Court affirmed Burton's judgment of sentence (ECF 25-7 at 1-23) and the Pennsylvania Supreme Court denied a petition for allowance of appeal on August 15, 1997. (ECF 26-1 at 1.) Burton did not file a petition for certiorari with the United States Supreme Court. Accordingly, his judgment of sentence became final on or around November 13, 1997, when the 90-day period for him to do so expired. *Caspari v. Bohlen*, 510 U.S. 383, 390 (1994) (citing *Griffith v. Kentucky*, 479 U.S. 314, 321, n.6 (1987) ("[a] state conviction and sentence become final for purposes of retroactivity analysis when the availability of direct appeal to the state courts has been exhausted and the time for filing a petition for a writ of certiorari has elapsed or a timely filed petition has been finally denied.")).

3

In 1998, Burton filed in state court his first petition for collateral relief under Pennsylvania's Post Conviction Relief Act ("PCRA"). After the state court denied his request for PCRA relief, Burton filed his first federal habeas petition in this Court, which was docketed at civil action number 2:07-cv-516. This Court denied that petition.

Many years later, in May 2013, Burton received a letter from Charlotte Whitmore, an attorney with the Pennsylvania Innocence Project. (ECF 29-1 at 20-21.) The letter included a copy of a pro se "motion for partial expunction of adult criminal record" filed by Goodwine in July 2009. (*Id.* at 23-37.) In this motion and accompanying affidavit, Goodwine averred that he murdered Floyd "in self-defense" but was "advised not to use this defense at trial." (*Id.* at 30.) Goodwine further averred that "an innocent man went to jail for a crime that [Goodwine] committed." (*Id.*)

Attorney Whitmore explained to Burton that she received copies of Goodwine's motion to expunge, and the trial court's opinion denying it, from Twyla Bivens (the mother of Burton's oldest son), who said she had received them from Goodwine's ex-girlfriend. Attorney Whitmore further explained that the Innocence Project was still investigating whether it would become involved in Burton's case. She advised Burton that if he was previously unaware of the statements made by Goodwine in his motion to expunge he should consider filing another state collateral petition under that provision of the PCRA that allows an inmate to file a timely petition within a certain amount of time after the discovery of new evidence of innocence.[3] (*Id.* at 20-21.)

---

[3] The PCRA has a one-year statute of limitations, which is codified at 42 Pa.C.S. § 9545(b). It is jurisdictional. *Commonwealth v. Ali*, 86 A.3d 173, 177 (Pa. 2014). It provides: "(1) [Any PCRA petition], including a second or subsequent petition, shall be filed within one year of the date the judgment becomes final, unless the petition alleges and the petitioner proves that .... (ii) the facts upon which the claim is predicated were unknown to the petitioner and could not have been ascertained by the exercise of due diligence[.]" 42 Pa.C.S. § 9545(b)(1)(ii). When Burton filed his *Footnote continue on next page…*

Soon thereafter, in July 2013, Burton filed a *pro se* PCRA petition in which he raised what he and the state courts often referred to as his "Goodwine claim." In this claim, Burton asserted he was entitled to a new trial based on the information provided to him by Attorney Whitmore, which he maintained established that he was innocent of Floyd's murder.[4] (*Id.* at 1-46; ECF 1-2 at 162-73.) Over the next several years the trial court (now the PCRA court) and the state appellate courts issued decisions that are not relevant to the issues now before this Court.[5]

By May 2017, Burton, now represented by an attorney,[6] filed the relevant amended, counseled PCRA petition (ECF 15-1 at 2-43) and supplements thereto (ECF 31-1 at 1-22; ECF 31-2 at 1-24). In these filings, Burton raised his Goodwine claim and also two sets of new claims

_____

pro se PCRA petition in July 2013, the statute provided that a petitioner asserting his petition was timely filed under this provision had to file his petition "within 60 days of the date the claim could have been present." *Id.* § 9545(b)(2) (2013).

[4] The PCRA at § 9543(a)(2) lists what types of substantive claims may be litigated in a post-conviction proceeding. Federal constitutional claims are cognizable, including prosecutorial misconduct claims brought under *Brady v. Maryland*, 373 U.S. 83 (1963) and *Napue v. Illinois*, 360 U.S. 264 (1959), and ineffective assistance of counsel claims brought under *Strickland v. Washington*, 466 U.S. 668 (1984). Also cognizable under the PCRA are claims alleging "[t]he unavailability at the time of trial of exculpatory evidence that has subsequently become available and would have changed the outcome of the trial if it had been introduced." 42 Pa.C.S. § 9543(a)(2)(vi); *see also Albrecht v. Horn*, 485 F.3d 103, 123 (3d Cir. 2007) (describing this part of the PCRA as "the provision of the state post-conviction relief act dealing with claims of innocence based on after discovered evidence.").

In Burton's PCRA proceeding he could litigate a freestanding claims of actual innocence under § 9543(a)(2)(vi). As explained in more detail below, § 9543(a)(2)(vi) does not have a counterpart in the federal habeas statute (28 U.S.C. § 2254), and neither the United States Supreme Court nor the United States Court of Appeals for the Third Circuit has held that a freestanding claim of actual innocence is a cognizable federal habeas claim. Thus, a petitioner can raise a freestanding claim of actual innocence under § 9543(a)(2)(vi) in his PCRA proceeding, but such a claim is not available to that same petitioner in a federal habeas case, which, as discussed below, requires a petitioner to establish a (1) violation of *federal constitutional right* that is (2) available to him under the non-retroactively doctrine that applies to federal habeas cases.

[5] Much of the litigation during the first several years of Burton's PCRA proceeding involved whether Burton's Goodwine claim was timely filed under § 9545(b)(1)(ii). The PCRA court ultimately determined that it was and the Superior Court affirmed this decision in *Commonwealth v. Burton*, 2019 WL 2244758, at *6 (Pa. Super. Ct. May 24, 2019).

[6] Burton's PCRA counsel continues to represent him in this federal habeas case.

premised on the alleged recantation of the trial testimony given by two Commonwealth witnesses: Marvin Harper and Brian O'Toole.[7]

The first set of new claims were premised on a notarized affidavit executed by a Marvin Harpool in February 2014. (ECF 15-1 at 22.) An individual named Marvin Harper, who was also known as Marvin Harpool, testified at the 1993 trial and his testimony was summarized above. To briefly reiterate, Harper testified that on the day of Floyd's murder he and another inmate, Micah Goodman, walked by Floyd's cell twice. Harper testified that he saw Burton and Goodwine pinning Floyd down inside the cell. (Trial Tr. at 567-75.)[8] In the 2014 affidavit, however, a Marvin Harpool averred that he knowingly gave false testimony at the trial and that the "homicide was not witnessed by me." (ECF 15-1 at 22.) He also averred that during the investigation of Floyd's murder he "was informed by the county jail guards" that if he "would be willing to provide any information which would link Mr. Burton to [the] homicide that [he] could receive a legal favor in exchange for this information." (*Id.*) He then "notif[ied] the prison guards that [he] had actually witnessed Mr. Burton commit the particular homicide" and in exchange for his assistance, and in a deal approved by the District Attorney, his $50,000 bond was "dropped" and he was released from prison. (*Id.*)

Burton claimed that he was entitled to a new trial because the Harper who had testified at this trial had recanted his trial testimony in 2014. Burton also claimed that he was entitled to relief under *Brady* and *Napue* because the Commonwealth suppressed the agreement it allegedly had

---

[7] In his pleadings, Burton spells O'Toole first name as "Brien." In the trial transcript and state court opinions, O'Toole's first name is spelled "Brian," which is the spelling this Court uses.

[8] Burton suggests that since Harper allegedly recanted his trial testimony, Micah Goodwine likely also provided false trial testimony. (ECF 15 at 58.) He argues that Harper's allegedly "credible affidavit…not only destroys [Harper's] trial narrative, but it also destroys Goodman's trial narrative." (*Id.*)

with Harper and then knowingly let Harper testify falsely at trial that he did not know why he was released from jail shortly after Floyd's murder.[9] (ECF 31-1 at 9-22.) These are referred to as the "Harper claims."

The second set of new claims Burton raised were premised on an interview Burton's attorney and his investigator conducted with O'Toole at SCI Fayette on July 20, 2017. Burton describes O'Toole as the Commonwealth's "premeditation" witness. (ECF 15 at 17-18.) As explained above, O'Toole testified that he was working in the mental health unit of the ACJ in March 1993 just before Floyd's murder. (Trial Tr. at 649.) According to O'Toole's trial testimony, Burton asked him to find Goodwine and tell him that he (Burton) was "going to be transferred [from the mental health unit] straight to the Annex and that they weren't going to be able to do anything with [Floyd]." (*Id.* at 650-51.) Once he delivered this message, O'Toole testified at the trial, Goodwine told him to tell Burton "to stay where he is at, not to get transferred because they had to do it." (*Id.* at 652.)

Burton claimed that during the July 20, 2017 interview conducted by Burton's attorney and his investigator, Zachary Stern, O'Toole admitted that he fabricated that part of his trial testimony that referenced Floyd. O'Toole did so, Burton claimed, because O'Toole knew that Burton and Goodwine were suspects in Floyd's murder and he was hoping to receive a benefit in exchange for providing helpful information to investigators. In what are referred to as the "O'Toole claims,"

---

[9] To establish a *Brady* claim, a petitioner must prove that: (1) the evidence at issue was favorable to the defense, either because it was exculpatory or because it was impeaching; (2) the Commonwealth suppressed the evidence; and (3) there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *See, e.g.*, *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). To establish a *Napue* claim, a petitioner must show that: (1) *the prosecution knowingly solicited false testimony or knowingly allowed it to go uncorrected when it appeared*; and (2) there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. *See, e.g.*, *Glossip v. Oklahoma*, 145 S. Ct. 612, 626 (2025); *United States v. Agurs*, 427 U.S. 97, 103 (1976).

Burton asserted that he was entitled to PCRA relief because O'Toole recanted his trial testimony and admitted he knowingly gave false testimony at the trial. (ECF 31-2 at 1-24.)

The PCRA court held its first relevant evidentiary hearing on October 5, 2017. This hearing was limited to Burton's Goodwine claim. Twyla Bivens, Attorney Whitmore, and Burton provided testimony relevant to the issue of when Burton first learned of Goodwine's exculpatory statements and whether Burton timely filed his PCRA petition.[10] (PCRA Hr'g Tr., 10/5/17, ECF 31-3 at 3-29, 35-37.)

As to the merits of the Goodwine claim, Burton introduced into evidence the papers related to Goodwine's expungement motion. (*Id.* at 35.) Burton had subpoenaed Goodwine and he was present at the hearing but Burton's counsel told the court that Goodwine intended to invoke his Fifth Amendment right not to testify. (*Id.* at 29.) Goodwine's attorney (who was appointed by the PCRA court), confirmed that his client intended to exercise his "right to remain silent because his answers may tend to incriminate him." (*Id.* at 30.) When the Commonwealth's attorney asked Goodwine's counsel "as to what crime" his client was claiming his testimony might implicate him, Goodwine's counsel replied: "Perjury, unsworn falsification to authorities, and homicide in the federal courts." (*Id.*) Goodwine then took the stand and stated the following in response to each question posed about his motion to expunge: "On the advice of my counsel, I exercise my Fifth Amendment right to remain silent because my answers may tend to incriminate me." (*Id.* at 32-34.)

At the conclusion of this hearing, the PCRA court judge held that the confession in Goodwine's expungement motion was not credible and that the Goodwine claim would be denied

---

[10] Attorney Whitmore's testimony, and the letters she wrote to Burton and Bivens, were admitted into the record by stipulation. (PCRA Hr'g Tr., 10/5/17, ECF 31-3 at 35-36.)

for that reason. (*Id.* at 48-49.) The PCRA court judge's decision was based in part on the fact that she purportedly had found Goodwine not credible at an earlier but otherwise undescribed hearing. (*Id.*)

The Harper and O'Toole claims remained pending and Burton was still conducting discovery on them, including on the *Brady* and *Napue* allegations he asserted among his Harper claims.[11] (*Id.* at 46-49; ECF at 34-2 at 15-23.) Another evidentiary hearing was scheduled at which Burton would have the opportunity to introduce evidence to support these claims. (*Id.*)

The next evidentiary hearing was held on February 14, 2018. Burton had subpoenaed O'Toole to testify but the PCRA court canceled O'Toole's transportation order from SCI Fayette to the courthouse. The court did so because O'Toole had written to it and stated he "will not participate in this matter, that bringing him in would be a waste of time, place his life in danger, and that he would not add anything to the proceeding. (PCRA Hr'g Tr., 2/14/18, ECF 1-2 at 280-82; *see also* ECF 1-2 at 522.) O'Toole's attorney (who was appointed by the PCRA court), confirmed that his client would have refused to testify had he been transported to the hearing. (*Id.*)

Burton then presented testimony from his investigator, Zachary Stern, who testified that during the July 20, 2017 interview:

> [O'Toole] stated that Shawn Burton was a resident…in the Mental Health Unit [of the ACJ], approximately a week prior to [Floyd] dying in the jail.
> And that Mr. Burton, when he believed he was going to be transferred to the annex, asked Mr. O'Toole if he would pass a message to [Goodwine], that he [Burton] was going to be transferred and that was the extent of the message.
> Mr. O'Toole said he did pass this message along, and didn't think anything of it at the time[.]…
> After Mr. Floyd died, and Mr. O'Toole heard that Mr. Burton and Mr. Goodwine were being accused of Mr. Floyd's death, Mr. O'Toole stated that

---

[11] In his discovery requests, Burton asked for, among other things, documents related to the *Brady/Napue* violations he asserted in his Harper claims. (ECF 34-2 at 15-16.) At the conclusion of the October 5, 2017 hearing, the Commonwealth's counsel provided Burton's counsel with approximately 1,200 pages of discovery. (ECF 34-4 at 2.)

> he put two and two together, and figured that the aforementioned message to be sent was related to intent.

(*Id.* at 298-99.)

At this same hearing, Burton's counsel advised the PCRA court that had tried to interview at SCI Mercer a man who he thought was the Harper who had testified at the 1993 trial, but that that man refused the interview. (*Id.* at 292.) Counsel also explained that he had been unable to serve a subpoena on that same man, who was no longer incarcerated. (*Id.* at 288-89.) Burton did not attempt to introduce the February 2014 affidavit into evidence[12] or present any other evidence to support the *Brady* or *Napue* allegations he made in his Harper claims.

The PCRA court indicated at the hearing that Burton failed to establish he was entitled to relief on his O'Toole and Harper claims. (*Id.* at 286-94, 302-03.) Several days later, on February 22, 2018, the PCRA court issued an order denying Burton's request for PCRA relief. (ECF 34-4 at 34.)

Burton appealed the PCRA court's order to the Superior Court. In this appeal, Burton argued: (1) the PCRA court erred in denying his Goodwine claim; and, (2) the PCRA court erred and violated his due process rights by striking O'Toole's transportation order before the February 14, 2018 evidentiary hearing. Burton did not raise any challenge to the PCRA court's

---

[12] Harper was actually deceased by the time of the February 14, 2018 PCRA hearing, and the individual whom Burton's attorney and his investigator tried to interview in 2017 at SCI Mercer and then later unsuccessfully attempted to subpoena was not the same Marvin Harper who had who testified at the 1993 trial. (ECF 15 at 50-53.) Sometime after this hearing, Burton's counsel learned that the Harper who had testified at the 1993 trial died in 2015, as evidenced by an October 2015 newspaper article that referenced Harper's death. (*Id.* at 53-54.)

Burton now contends that the 2014 affidavit is admissible under Rule 804(b)(3) of the Pennsylvania Rules of Evidence (ECF 15 at 55-57), but he did not make this argument during the PCRA hearing. Respondents contend that the 2014 affidavit "is inadmissible hearsay and there is no way to know who wrote it and under what circumstances." (ECF 20 at 78.) For this Court's purposes, the important fact is that the 2014 affidavit was not introduced into the evidentiary record of this case.

decision to deny his Harper claims, including the *Brady* and *Napue* claims. (ECF 31-6 & ECF 31-7.)

In 2019, the Superior Court issued *Commonwealth v. Burton*, 2019 WL 2244758 (Pa. Super. Ct. May 24, 2019). It rejected Burton's challenge to the PCRA court's cancellation of O'Toole's transportation order but vacated the PCRA court's decision to the extent that it denied the Goodwine claim. *Id.* at *7-12. The Superior Court agreed with Burton that the PCRA court judge's credibility determination lacked record support because, among other things, the judge "could not recall the date of the 'prior hearing' at which she found Goodwine incredible, and she did not offer any details regarding the context or content of Goodwine's alleged testimony at the unspecified proceeding." *Id.* at *9. The Superior Court concluded that since the "decision to deny [the Goodwine claim] was premised on this credibility determination, we must vacate [the PCRA court's] order denying Burton's petition and remand for further proceedings." *Id.* at *11. It instructed:

> On remand, the PCRA court must make credibility determinations regarding Goodwine's confession that are supported by the record before it. If the court finds Goodwine's confession credible, it must then assess whether his statements in the motion to expunge would be admissible as substantive evidence, and whether that evidence would likely result in a different verdict if a new trial were granted.

*Id.* (footnote omitted).[13]

After the remand, Burton filed a memorandum of law in support of his position that Goodwine's confession was credible. (ECF 32-1 at 1-52.) In addition to relying on the statements Goodwine made in his expungement motion, Burton also relied on a statement contained in

---

[13] The judge who had presided over the 1993 trial and PCRA proceedings (Judge McDaniel) had retired during the appeal and, therefore, after the remand the case was reassigned to a new judge (Judge Flaherty).

Goodwine's parole file, dated September 16, 2009, in which he confessed to strangling Floyd. (*Id.* at 20.)

The PCRA court held a hearing on October 3, 2019. Burton was permitted to introduce into evidence Goodwine's relevant parole records. No additional evidence was proffered or introduced. The parties presented oral argument in support of their respective positions. (PCRA Hr'g Tr., 10/3/2019, ECF 1-2 at 59-104.)

The PCRA court later issued findings of fact and conclusions of law and a final order denying Burton relief on his Goodwine claim. (ECF 33-1 at 10-23.) It held that Goodwine's confession did not contain "the necessary indicia of reliability to deem it to be credible." (*Id.* at 18, explaining:

> On September 3, 2008, the PBPP denied Goodwine's application for parole. In their Notice of Board Decision, the PBPP listed three (3) reasons for their denial: his lack of remorse for the offense committed, his institutional behavior, and his interview with the hearing examiner and/or PBPP member. In this denial letter, Goodwine was notified that his case would not be reviewed until December 2009 and that he was unable to file a petition for parole for one year from the date of the letter, i.e.—until September 3, 2009.
>
> On July 29, 2009, approximately one month before he was eligible to re-petition for parole, Goodwine filed a Motion for Partial Expunction of Adult Criminal Record where he asked that the homicide charges for which he was acquitted be expunged from his record. In that Motion, Goodwine stated, in relevant part: "a requirement of the Pennsylvania Parole Board is to accept and own full responsibility or your crime… The Parole Board and [Goodwine's] Agent, Ms. Patton, were given a written and verbal account of [Goodwine's] crime. [Goodwine] committed this act in self-defense." (M. for Partial Expunction, p. 2, ¶ 4). Further, Goodwine stated, "[I have] already admitted to the Parole Board that I committed this act on my own in self-defense. [I] also admitted and take[ ] full responsibility and ownership that an innocent man went to jail for a crime that I committed. Nonetheless: Because I was acquitted on the murder charge, [I] want[] the murder charge and the other charges under this [OTN] number that was *nolle prossed* and withdrawn expunged from my criminal record." (M. for Partial Expunction, p. 2, ¶ 5). Goodwine's purpose in filing the Motion was as follows:
>
>> It is very important concerning [my] future employment, housing, and education that the current status in my documented criminal record be corrected by expungement. The adverse consequence [I] may endure should expunction be denied is that I

may be denied employment, housing, and education. Also, it has negatively influenced my chances for such things as reduction of prison custody level, promotional transfers, institutional job training, and selfhelp [sic] programs. [My] arrest record will prejudice my future employment, housing, and education opportunities.

This will cause me to suffer further humiliation and embarrassment upon release. There is no legitimate state interest or benefit to law enforcement to maintain an arrest record that ended in a dismissal.

(M. for Partial Expunction, p. 3, ¶ 6).

On September 16, 2009, in conjunction with his parole proceedings, Goodwine wrote the following in his "Offender's Written Version of Offense" at SCI-Huntingdon:

I went to Mr. Floyd's cell to fight. The fight was getting out of control, and in the middle of our struggle I strangled Mr. Floyd[] to death with a shoestring I had wrapped around my hand during the fight. I made a very bad decision in not reporting the incident and to this very day I regret that decision in not reporting what happened in that cell.

Because Mr. Floyd could still be alive if I had reported the crime and I fully understand how that failing to alert the proper authorities has left me looking like a cold blooded killer which I am not and through soul searching and countless groups I intend to convey that I totally understand the magnitude of my actions and that my actions will never be repeated. I now know the pain my actions caused to his family and also my family and children.

(PBPP Statement, 9/16/09). Goodwine was granted parole on January 8, 2010.

Goodwine was called to testify before Judge McDaniel on October 5, 2017. On that date Goodwine was represented by counsel and invoked his Fifth Amendment Privilege against self-incrimination. This invocation was accepted, and, therefore, Goodwine is unavailable as a witness.

The credibility assessment of Goodwine's statements is limited to the circumstances surrounding their making, as Goodwine's testimony cannot be compelled. Initially, this Court notes that at the time Goodwine drafted and submitted the Motion for Partial Expunction, he had not yet drafted and submitted his statement to the PBPP. As such, there is a factual inaccuracy within his Motion, as he claimed to have already submitted his statement to the PBPP. Further, the purpose of his Motion was to expunge the homicide charges from his record. This Court finds that Goodwine made statements in his Motion in order to receive a personal benefit, which diminish their reliability.

13

Additionally, Goodwine was well aware that the PBPP requires an offender to accept responsibility for his crime as a consideration of parole. It was not until after he was denied parole on this basis that Goodwine made this written statement. It is significant to note that Goodwine did not admit to conspiracy to commit murder, which is the crime for which he was convicted. Rather, he stated that he killed Floyd in self-defense. This assertion is contrary to the evidence presented at trial as is discussed below.

Taking all of the facts and circumstances into consideration, this Court does not find Goodwine's statement to bear the necessary indicia of reliability to deem it to be credible.

(*Id.* at 15-18) (some altered text added by this Court).

The PCRA court also held that when Goodwine made the statements in his motion to expunge and to the PBPP he "was likely familiar with the concept of Double Jeopardy and under the belief that he could not be prosecuted for" killing Floyd since he had been acquitted of murdering Floyd at the 1993 trial. (*Id.* at 20.) Thus, Goodwine may have confessed to killing Floyd, thereby providing Burton with exculpatory new evidence to use to try to overturn Burton's convictions, because Goodwine may have thought that any statements made by him would not expose him to additional criminal liability related to Floyd's death. (*Id.*)

Relatedly, the PCRA court also held that Goodwine's confessions would not be admissible at a trial as substantive evidence. (*Id.* at 18-20.) Finally, after summarizing the evidence introduced at the 1993 trial, the PCRA court held that the evidence "outweighs any self-serving statement made by Goodwine, and, therefore, the outcome [of a trial] is unlikely to change if a new trial were granted." (*Id.* at 23.)

Burton appealed to the Superior Court, asserting that: (1) the PCRA court's credibility determination was not supported by the record; and, (2) the PCRA court erred when it determined that Goodwine could not be compelled to testify if another trial were held and that his confessions would not likely produce different verdicts if Burton was retried. *Commonwealth v. Burton*, 2021 WL 306192, at * 5 (Pa. Super. Ct. Jan. 29, 2021).

14

The Superior Court affirmed the PCRA court's order, concluding:

Here, the record supports the [PCRA] court's finding that the reliability of Goodwine's statements was diminished by his attempt to receive a personal benefit. On this basis alone, the court's credibility determination was proper.[7] As the PCRA court properly determined that [Burton's] after-discovered evidence is incredible, such evidence would not compel a different outcome at trial, and we need not analyze [his] remaining claims. Accordingly, we affirm the order denying PCRA relief.

[7] To the extent [Burton] also complains about "assumptions" made by the PCRA court, we reiterate that [Burton] bore the burden of establishing his entitlement to relief based upon after-discovered evidence. Rather than making assumptions, our review of the record reveals that the PCRA court simply analyzed the evidence [he] submitted with his various PCRA filings. If such evidence did not accurately portray the state of Goodwine's parole records, this was due to [Burton's] own inability to procure such records.

*Id.* at * 8 (internal citations omitted).

After the Pennsylvania Supreme Court denied Burton's petition for allowance of appeal, he commenced this federal habeas case. This case was then stayed while Burton moved in the Court of Appeals for authorization to file a second habeas petition. (ECF 1, 2.) After the Court of Appeals granted him authorization to file second petition under 28 U.S.C. § 2244 (ECF 4), the stay in this case was lifted, and the Court issued a scheduling order. (ECF 9.)

Thereafter, Burton was granted leave to file the Amended Petition (ECF 15), which is the operative pleading. Burton raises these four grounds for relief:

Claim I    His "trial was unconstitutional because it's reasonably likely that [Brian] O'Toole's knowingly false testimony may've impacted the jury's decision to convict [him] of first-degree murder and criminal conspiracy and because the DAO [the District Attorney's Office] has yet to correct the record based on [Brian] O'Toole's readily admitted false testimony."

Claim II    His "trial was unconstitutional because, based on Melvin Goodwine's credible confessions and [Brian] O'Toole's credible admission: (1) the numerous ACJ inmates who testified for the DAO gave knowingly false eyewitness testimony when they claimed to have seen [him] and Melvin Goodwine wrestling with Seth Floyd in Seth Floyd's cell; (2) investigators and the DAO should've known that the testimony of these ACJ inmates was false; (3) the DAO has known about Melvin Goodwine's credible confessions since July 2009 and [Brian]

15

> O'Toole admitted false testimony since 2017; and (4) the DAO has yet to correct all the false testimony presented by these ACJ inmates."

Claim III    His "trial was unconstitutional because it's reasonably likely Marvin Harper's knowingly false testimony may've impacted the jury's decision to convict [him] of first-degree murder and criminal conspiracy and the DAO has yet to correct the record based on Marvin Harper's readily admitted false testimony."

Claim IV    His "continued incarceration is unconstitutional because, based on Melvin Goodwine's credible confession and Brien O'Toole's credible admission, [he] is actually innocent of the first-degree murder and conspiracy convictions that cause his current and continued incarceration."

(ECF 15 at 7-8.)

Burton explains in the Amended Petition that in Claims I, II and III he is asserting due process violations under the rule of *Napue*. (*Id.* at 72-78, 81-85, 86-87.) He explains that in Claim IV—his "actual innocence claim"—he is asserting that "his continued incarceration violates the Eighth and Fourteenth Amendments[.]" (*Id.* at 91.)

Burton admits that he did not exhaust any of these federal constitutional claims in state court and, as a result, procedurally defaulted each of the claims he raises in the Amended Petition. (*Id.* at 71, 79, 86, 88.) He asserts that this Court should excuse his default under the actual-innocence "gateway" to federal habeas review developed in *Schlup v. Delo*, 513 U.S. 298 (1995) and then review each claim de novo. (*Id.*) As explained below, however, before this Court could even consider whether Burton has overcome the default of his claims, it must first evaluate whether any of them survive dismissal under the narrow exception applicable to new claims raised in second or successive habeas petitions set forth at 28 U.S.C. § 2244(b)(2)(B). That is because this Court must dismiss any claim for which Burton has not satisfied the requirements of § 2244(b). 28 U.S.C. § 2244(b)(4) ("A district court shall dismiss any claim presented in a second or successive application that the court of appeals has authorized to be filed unless the applicant shows that the claim satisfies the requirements of this section.")

Respondents have filed the Answer (ECF 20) opposing the Amended Petition. At the Court's request, each party also filed additional briefing (ECF 41, 45) to address *Marcy v. Superintendent Phoenix*, 110 F.4th 210 (3d Cir. 2024), which the Court of Appeals decided after it granted Burton authorization to file a second or successive habeas petition and which is relevant to the disposition of most of his claims.

## II.    Discussion

The federal habeas corpus statute applicable to this case is 28 U.S.C. § 2254, which governs petitions filed by petitioners who are challenging a state-court conviction or sentence. It permits a federal court to grant a state prisoner the writ of habeas corpus "on the ground that he or she is in custody in violation of the Constitution…of the United States." 28 U.S.C. § 2254(a). Errors of state law are not cognizable. *Id.*; *see, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). It is Burton's burden to prove that he is entitled to the writ. *See, e.g.*, *Vickers v. Sup't Graterford SCI*, 858 F.3d 841, 848-49 (3d Cir. 2017).

In 1996, Congress made important amendments to the federal habeas statutes with the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone,* 535 U.S. 685, 693 (2002) (citing *Williams v. Taylor*, 529 U.S. 362, 403-04 (2000)). It reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 562 U.S. 86, 102-03 (2011) (internal quotations and citation omitted).

### A.    AEDPA's Requirements for New Claim Second or Successive Petitions

That part of AEDPA codified at 28 U.S.C. § 2244(b) "established a stringent set of procedures that a prisoner 'in custody pursuant to the judgment of a State court,' 28 U.S.C. § 2254(a), must follow if he wishes to file a 'second or successive' habeas corpus application challenging that custody[.]" *Burton v. Stewart*, 549 U.S. 147, 152 (2007); *Benchoff v. Colleran*, 404 F.3d 812, 816 (3d Cir. 2005) ("Unless both the procedural and substantive requirements of § 2244 are met, the District Court lacks authority to consider the merits of the petition.") AEDPA required that the Court of Appeals first authorize Burton to file a second or successive habeas petition. 28 U.S.C. § 2244(b)(3)(A). Having received that authorization (ECF 4),[14] AEDPA now requires that Burton show, with respect to each claim he is raising, that:

(1)    "the factual predicate for the claim could not have been discovered previously through the exercise of due diligence;" AND

(2)    "the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found [him] guilty of the underlying offense."

*Id.*, § 2244(b)(2)(B)(i)-(ii). AEDPA requires that this Court dismiss a claim if Burton does not establish both of these factors with respect to it. *Id.* § 2244(b)(4).

---

[14] By authorizing Burton to file a second or successive habeas petition, the Court of Appeals determined that he had made a prima facie showing of § 2244(b)(2)(B)'s requirements. *See, e.g.*, *In re Hoffner*, 870 F.3d 301, 303 (3d Cir. 2017). The Court of Appeals "emphasize[d]" its determination was only the "preliminary" hurdle Burton had to overcome to proceed with the claims in his second or successive petition. (ECF 4.) *See also Goldblum v. Klem*, 510 F.3d 204, 219-20 (3d Cir. 2007) ("it is clear that Congress did not intend to bind the district court in any way by a court of appeals' preliminary examination of the substantive requirements under section 2244(b)(2), except to the extent that if a court of appeals finds that a petitioner has made a prima facie showing, the district court is obligated to conduct an independent gatekeeping inquiry under section 2244(b)(4).")

Burton asserts that he has satisfied § 2244(b)(2)(B)(i)'s "diligence" standard because the factual predicates of his claims (Goodwine's confessions, O'Toole's alleged recantation, and Harper's alleged 2014 affidavit) were not available when he litigated his first federal habeas petition. Respondents dispute that Burton has satisfied the "diligence" standard. The Court need not decide this issue, however. That is because, for the reasons below, Burton has not satisfied with respect to any of his claims the other required provision of § 2244(b)(2)(B)—that set forth at subparagraph (ii).

### B.     Some of Burton's *Napue* Claims and His Claim of Actual Innocence Do Not Present Claims of Constitutional Error and For That Reason He Cannot Satisfy § 2244(b)(2)(B)(ii)

As recited above, to satisfy subparagraph (ii) of § 2244(b)(2)(B) as to each claim, Burton must show "the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found [him] guilty of the underlying offense." This subparagraph of § 2244(b)(2)(B) requires a "gateway" showing of actual innocence that is similar to, although not identical to, that which is required under *Schlup*'s miscarriage of justice exception. *Jones v. Hendrix*, 599 U.S. 465, 502 n.4 (2023) (Jackson, J. dissenting) ("Prior to AEDPA, an individual who wished to file a successive petition claiming factual innocence on the basis of new evidence needed only to show that it was "more likely than not" that the jury would have acquitted him. *Schlup v. Delo*, 513 U.S. 298, 327 (1995). But, with AEDPA, Congress narrowed the scope of available relief for factual innocence claims by requiring prisoners to make their showing by the more stringent 'clear and convincing evidence' standard."); *McQuiggin v. Perkins*, 569 U.S. 383, 395-96 (2013) (same).

This Court's analysis under § 2244(b)(2)(B)(ii) necessarily requires it to make the predicate determination that Burton is actually raising a claim that is available in a federal habeas case (meaning, that he is asserting a cognizable claim of constitutional error). *In re Dailey*, 949 F.3d 553, 559-60 (11th Cir. 2020) (the petitioner could not satisfy § 2244(b)(2)(B)(ii) on his "actual innocence claim" because a freestanding claim of actual innocence was not available in a federal habeas case); *Gimenez v. Ochoa*, 821 F.3d 1136, 1143 (9th Cir. 2016) ("section 2244(b)(2)(B)(ii) also requires petitioner's to state a predicate 'constitutional error.'") (quoting *Case v. Hatch*, 731 F.3d 1015, 1032 (10th Cir. 2013), which held: "subparagraph (B)(ii) requires the applicant to identify a constitutional violation and show that he would not have been found guilty 'but for' the violation.")).

Given the nature of Burton's claims, this analysis requires this Court to review each of them under the non-retroactivity doctrine of *Teague v. Lane*, 489 U.S. 288 (1989). *Marcy*, 110 F.4th at 215 n.10 (whether a habeas claim is barred by *Teague's* non-retroactivity doctrine "is a threshold question in every habeas case.") Under the *Teague* doctrine, a federal habeas petitioner generally cannot rely on a novel constitutional rule to obtain relief because such rules rarely apply retroactively to cases on collateral review. 489 U.S. at 310. Only a new rule that "alter[s] the range of conduct or the class of persons that the law punishes applies retroactively on federal collateral review." *Edwards v. Vannoy*, 593 U.S. 255, 276 (2021) (internal quotation and citation omitted); *Marcy*, 110 F.4th at 215 ("To ensure that habeas proceedings cannot be used as a vehicle to create new constitutional rules of criminal procedure, a novel rule cannot be applied retroactively to cases on collateral review unless it is substantive[,] [m]eaning it places certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe, or prohibits imposition of a certain type of punishment for a class of defendants because of their status

or offense.") (internal quotations and citations omitted). In contrast, new rules that "alter only the manner of determining the defendant's culpability…do not apply retroactively on federal collateral review." *Id.*; *see also Marcy*, 110 F.4th at 214-16.

"A rule is new 'if the result was not *dictated* by precedent existing at the time the defendant's conviction became final." *Marcy*, 110 F.4th at 215 (quoting *Teague*, 489 U.S. at 301) (emphasis in original).

Claims I, II and III are premised on Burton's contention that Goodwine's confessions, the statements O'Toole allegedly made during the July 20, 2017 interview, and the statements allegedly made by Harper in the 2014 affidavit entitle him to habeas relief because his right to due process has been violated under the rule of *Napue*. Burton contends that he can establish a *Napue* violation under two separate and independent scenarios.

Burton's first scenario presents the well-established *Napue* violation: the prosecution violated his right to due process because at his 1993 trial it presented testimony that it knew or should have known was false. Claims advanced under this first scenario survive review under *Teague's* non-retroactively doctrine because that rule of *Napue* was dictated by precedent at the time Burton's conviction became final in 1997. *Marcy*, 110 F.4th at 217 (citing cases, including *Napue* and *Mooney v. Holohan*, 294 U.S. 103 (1935)).

Under the second scenario presented by Burton, he maintains that his right to due process has been violated because the prosecution allegedly learned during the litigation of his PCRA proceeding that he was convicted on the basis of false evidence but has "failed to correct the false evidence" by agreeing that his convictions should be vacated. (ECF 15 at 73; *id.* at 75-77, 83-85, 87.) The claims Burton advances under this second scenario are foreclosed by the Court of Appeals' 2024 decision in *Marcy*.

21

In *Marcy*, the petitioner, Joseph Marcy, was convicted of rape of a child and related crimes and sentenced to 20-40 years' incarceration. 110 F.4th at 211-12. During Marcy's PCRA proceeding, the victim (his daughter) recanted her trial testimony. *Id.* at 212-13. Marcy claimed this new exculpatory evidence entitled him to relief under the PCRA's actual-innocence provision at § 9543(a)(2)(vi). *Id.* at 213; *see* footnote 4, *supra*. The PCRA court agreed, *found that the victim credibly recanted her trial testimony*, vacated Marcy's conviction, and granted him a new trial. *Id.* at 213. The Superior Court reversed the PCRA court's decision, holding that Marcy's claim was both waived and timebarred. *Id.*; *Commonwealth v. Marcy*, 2016 WL 4893713, at *4 (Pa. Super. Ct. July 1, 2016).

In his subsequent federal habeas proceeding, Marcy claimed, as Burton does here, that his continued incarceration for a conviction resulting from testimony the prosecution now knows was false violates his right to due process.[15] *Id.* at 215. The Court Appeals rejected this claim, explaining that to accept it would require it to apply "a novel rule of criminal procedure" in contravention of *Teague's* non-retroactivity doctrine. *Id.* at 220-21. In so holding, the Court of Appeals explained that neither it nor the United States Supreme Court has recognized the alleged due process right to be released from a conviction involving recanted testimony *where no state actor knew or should have known about the falsity of the statements at the time of the trial*. *Id.* at 215-19. Accordingly, the Court of Appeals held, Marcy's requested due process rule was not "dictated" by precedent at the time his judgment became final and, therefore, his due process claim was barred by *Teague*. *Id.* at 215-19.

---

[15] Marcy also asserted, as Burton does here, that he can avoid the procedural default of his due process claim under *Schlup's* actual innocence gateway. The Court of Appeals did not reach that issue because it determined that Marcy's due process claim did not survive the threshold question of whether it was barred by *Teague's* non-retroactivity doctrine.

In so holding, the Court of Appeals explained:

Marcy argues that his continued incarceration for a conviction resulting from testimony recanted after trial violates the Constitution, no matter how that testimony was introduced or whether any state actor knew it to be false. Simply stated, Marcy argues he has a right to be free from continued conviction obtained by credibly recanted testimony, regardless of the government's knowledge of the testimony's falsity. And he argues that this right existed at the time of his conviction. But neither the Supreme Court nor this Court have ever so held, and *Teague* bars a retroactive application of Marcy's claimed right as a novel rule of criminal procedure.

- - -

Marcy faces a second hurdle: his proposed rule can circumvent *Teague's* nonretroactivity principle only if it is "substantive," meaning it "prohibit[s] imposition of a certain type of punishment for a class of defendants because of their status or offense," *Sawyer v. Smith*, 497 U.S. 227, 241, 110 S. Ct. 2822, 111 L.Ed.2d 193 (1990), or changes the "range of conduct or the class of persons that the law punishes," *Schriro v. Summerlin*, 542 U.S. 348, 353, 124 S. Ct. 2519, 159 L.Ed.2d 442 (2004) (citation omitted). Marcy's proposed rule falls outside these "extremely narrow" corridors. *Id.* at 352, 124 S. Ct. 2519. It does not change what conduct can be criminalized, nor does it remove Marcy from a class of punishable offenders. It seeks instead to "regulate only the manner of determining the defendant's culpability," and is therefore a procedural rule that cannot be applied retroactively. *Id.* at 353, 124 S. Ct. 2519.

*Id.* at 21, 219-20.

Thus, in accordance with *Marcy*, this Court must conclude that the *Napue* claims Burton asserts in Claims I, II and III under his second scenario (his proposed rule that the right to due process has been violated because the prosecution allegedly learned during the PCRA proceeding that he was convicted on the basis of false evidence but has "failed to correct the false evidence") are barred by *Teague*.

Claim IV, Burton's "actual innocence" claim, is also barred by *Teague*. Neither the Supreme Court nor the Court of Appeals had held that a freestanding claim of actual innocence can be brought under the Eighth Amendment or the Fourteenth Amendment's Due Process Clause (or any other constitutional provision). As the Court of Appeals has explained, "[i]t has long been recognized that '[c]laims of actual innocence based on only newly discovered evidence' are never

23

grounds for 'federal habeas relief absent an independent constitutional violation.'" *Fielder v. Varner*, 379 F.3d 113, 122 (3d Cir. 2004) (quoting *Herrera v. Collins*, 506 U.S. 390, 400 (1993));[16] *Albrecht*, 485 F.3d at 121-22.

In fact, Marcy also argued that he was entitled to federal habeas relief on a freestanding claim that he was actually innocent and the Court of Appeals rejected that claim too. In so doing, the Court of Appeals explained that the Supreme Court has "repeatedly left that [issue] unresolved, while expressing considerable doubt that any claim based on alleged 'actual innocence' is constitutionally cognizable." 110 F.4th at 219 n. 20 (quoting *In re Davis*, 557 U.S. 952, 955 (2009) (Scalia, J., dissenting) and citing *Dist. Attorney's Off. for Third Jud. Dist. v. Osborne*, 557 U.S. 52, 71 (2009) (prisoner seeking DNA testing to show that he was innocent "obliquely relies on an asserted federal constitutional right to be released upon proof of 'actual innocence.' Whether such a federal right exists is an open question. We have struggled with it over the years, in some cases assuming, arguendo, that it exists while also noting the difficult questions such a right would pose and the high standard any claimant would have to meet."). Accordingly, Burton's freestanding actual innocence claim, as was Marcy's, "is insufficiently grounded to survive *Teague*." *Id.*[17]

---

[16] In *Herrera*, the Supreme Court left open the possibility that "in *a capital case* a truly persuasive demonstration of 'actual innocence' made after trial would render *the execution* of a defendant unconstitutional, and warrant federal habeas relief *if there was no state avenue open to process such a claim*." 506 U.S. at 417 (emphasis added.) It also emphasized that the required "truly persuasive demonstration" would be very difficult to make. *Id.* It acknowledged the "very disruptive effect that entertaining claims of actual innocence would have on the need for finality in capital cases, and the enormous burden that having to retry cases based on often stale evidence would place on the States." *Id.* That is why, the Supreme Court explained, "the threshold showing for such an assumed right would necessarily be *extraordinarily high*." *Id.* (emphasis added).

[17] If a freestanding claim of actual innocence was available to Burton, he has not met the "extraordinarily high" threshold that would be necessary to obtain relief on such a claim.

Burton argues that the Court of Appeals' decision in *Marcy* "is wrong." (ECF 21 at 14.) But *Marcy* is a precedential opinion of our Court of Appeals and is therefore binding on this Court. *See, e.g.*, *United States v. Green*, 610 F. Supp. 3d 711, 715 (W.D. Pa. 2022).

Burton also argues that the Court of Appeals' decisions in *Lee v. Glunt*, 667 F.3d 397 (2012) ("*Lee I*") and *Lee v. Houtzdale SCI*, 798 F.3d 159 (3d Cir. 2015) ("*Lee II*") "should drive this Court's due process analysis—not *Marcy*." (ECF 41 at 21.) The petitioner in *Lee I/II*, Han Tak Lee, was convicted of first-degree murder and arson after his 22-year-old daughter died in a cabin fire. In Lee's federal habeas case, he claimed that his continued incarceration violated his right to due process because the expert fire evidence the prosecution introduced at his trial was "premised on beliefs and practices of arson investigation which have, since the time of trial, been discovered and proven to be scientifically invalid." *See Lee v. Tennis*, 2010 WL 3812160, *2 (M.D. Pa. 2012); *see also Lee I*, 667 F.3d at 403. The district court denied this claim because it determined that, although Lee couched the claim as one asserting a due process violation, it was in fact a freestanding claim of actual innocence and, as such, was not cognizable in a federal habeas proceeding. *Id.* at *5.

The Court of Appeals reversed in *Lee I*. In so doing, it accepted Lee's assertion that he stated a due process claim rather than a non-cognizable freestanding actual innocence claim[18] and

---

[18] There is a circuit split on the validity of the due process rule the Court of Appeals accepted in *Lee I/II*. *See, e.g.*, *Nicholls v. Long*, 2022 WL 211617, at *7-10 (10th Cir. Jan. 25, 2022) (rejecting the petitioner's "due process" claim and concluding that it in fact was an "actual innocence" claim, which has never been held to be cognizable in a federal habeas case); *id.* at *9 ("It is notable…that state counsel on appeal in *Lee I* conceded that petitioner's claim sounded in due process and that 'this type of claim is cognizable in a federal habeas petition.' *Lee I*, 667 F.3d at 403 n.6. Consequently, the characterization of petitioner's newly discovered evidence claim as a due-process claim—cognizable in habeas proceedings—actually was not contested in the *Lee* litigation…. More importantly, even if *Lee I* is understood as holding that a petitioner's claim based on newly discovered scientific evidence may be in some instances characterized as a due-*Footnote continue on next page…*

25

it remanded the case to the district court. *Lee I*, 667 F.3d at 403 n.5, 407. On remand, the district court granted Lee relief on his due process claim, concluding that he established that the admission of the expert fire testimony at his trial "undermined the fundamental fairness of the entire trial because the verdict rested almost entirely upon scientific pillars which have now eroded." *Lee II*, 798 F.3d at 162 (citation modified) The Court of Appeals affirmed in *Lee II*.

Burton contends that *Lee I/II* governs this case because "the due process claim" raised by Lee "is identical to the due process claim Burton now raises." (ECF 41 at 21.) This argument has no merit. *Lee I/II* involved a due process claim premised on flawed forensic evidence while *Marcy*, like Burton's case, involved due process claims premised on recanted testimony of a non-state actor and a freestanding claim of actual innocence. In fact, Marcy argued in his federal habeas case that *Lee I/II* governed his claims. The Court of Appeals rejected this argument and distinguished *Lee I/II* on the grounds that the due process claim advanced in them "dealt with flawed forensic evidence or other junk science." 110 F.4th at 218 n.17 (citation modified).

Based on the above, the *Napue* claims Burton asserts in Claims I, II and III under his second scenario and his freestanding actual innocence claim in Claim IV do not assert an available claim of constitutional error. As a result, Burton cannot satisfy § 2244(b)(2)(B)(ii) with respect to them and they are dismissed for that reason.[19] 28 U.S.C. § 2244(b)(4).

---

process claim cognizable in habeas proceedings, [the petitioner] does nothing to explain why he should benefit from *Lee I* and its progeny here—let alone clarify how *Lee I* and *Lee II* (which he specifically cites) square with the Supreme Court's actual-innocence decision in *Herrera* and our own precedent applying it.")

[19] Another provision of AEDPA, codified at § 2244(b)(2)(A), allows a petitioner to avoid dismissal of a claim contained in a second or successive petition if he "shows that the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable[.]" Burton has not relied, and cannot rely, on this provision because the proposed rule he cites to support the *Napue* claims he raises under his second scenario and his freestanding actual innocence claim are novel rules which, as explained above, have never *Footnote continue on next page…*

**C.    Burton's Remaining Claims Do Not Satisfy § 2244(b)(2)(B)(ii) Because He Has Not Established By Clear and Convincing Evidence That But For the Purported *Napue* Violations No Reasonable Factfinder Would Have Found Him Guilty**

The only claims that remain are those set forth in Claims I, II and III in which Burton asserts *Napue* violations under the first scenario he presents (that his right due process has been violated because at his 1993 trial the prosecution presented testimony that it allegedly knew or should have known was false). Once again, to satisfy § 2244(b)(2)(B)(ii) with respect to these *Napue* claims, Burton is required to show the "facts underlying [these *Napue* claims], if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found [him] guilty of the underlying offense."[20]

To conduct this analysis, this Court must take into account two other relevant provisions of AEDPA. The first deals with deference this Court must give to any factual findings made by a state court. Findings of fact, including credibility determinations, made by a state court have always been accorded considerable deference in a federal habeas proceeding. AEDPA continued that deference and mandates that "a determination of a factual issue made by a State court shall be

---

been made retroactive by the Supreme Court to cases on collateral review. *Tyler v. Cain*, 533 U.S. 656, 658-64 (2001) (§ 2244(b)(2)(A) applies when the Supreme Court has held that a new rule is retroactively applicable to cases on collateral review).

[20] Section 2244(B)(2)(b)(ii)'s "evidence as a whole" provision means "all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial." *House v. Bell*, 547 U.S. 518, 538 (2006); *see also Munchinski v. Wilson*, 694 F.3d 308, 336-38 (3d Cir. 2012); *United States v. MacDonald*, 641 F.3d 596 (4th Cir. 2011). Thus, this Court must consider Goodwine's confessions even though the PCRA court held that this evidence would not be admissible as substantive evidence if another trial were held. Nevertheless, as discussed below, although this Court cannot exclude consideration of Goodwine's confessions, it cannot ignore that the PCRA court found them to be unreliable, which is a factual determination which this Court must presume to be correct under 28 U.S.C. § 2254(e)(1).

presumed to be correct." 28 U.S.C. § 2254(e)(1). Burton has the "burden of rebutting the presumption of correctness by clear and convincing evidence." *Id.*

The other relevant provision of AEDPA deals with limitations on further evidentiary development. "A petitioner may not simply attach documents to [his] habeas petition and ask the district court to consider them." *Wilcott v. Wilson*, 2010 WL 582367, *5 (W.D. Pa. Feb. 15, 2010). Rather, evidence relied on by the petitioner that was not admitted into the record in state court must be properly admitted into the record before the district court by way of an evidentiary hearing.[21] *Id.* AEDPA put into place "even more 'stringent requirements'" regarding evidentiary development of claims than those that were in place before its enactment. *Shinn v. Ramirez*, 596 U.S. 366, 381 (2022) (quoting *Williams v. Taylor*, 529 U.S. 420, 433 (2000)). As codified at 28 U.S.C. § 2254(e)(2), AEDPA provides:

> *If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim* unless the applicant shows that–
>
> (A)   the claim relies on–
>
> (i)   a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>
> (ii)   a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> (B)   the facts underlying the claim would establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

(Emphasis added).

---

[21] Under Rule 7 of the Rules Governing Section 2254 Cases in the United States District Courts, a district court also may expand the record to include uncontested evidence. *Williams v. Woodford*, 384 F.3d 567, 590-91 (9th Cir. 2004) (expansion of the record under Rule 7 is a permissible step that may avoid the necessity of an expensive and time consuming evidentiary hearing); *Boyko v. Parke*, 259 F.3d 781, 790 (7th Cir. 2001) (Rule 7 "can be used to introduce new factual information into the record in lieu of an evidentiary hearing").

The Court of Appeals has held that § 2254(e)(2) applies both to a district court's analysis of the merits of a claim as well as its determination of whether the petitioner has satisfied § 2244(b)'s factors to overcome AEDPA's second or successive petition requirements. *Goldblum v. Klem*, 510 F.3d 204, 220 n.11 (3d Cir. 2007) ("While an argument can be made that section 2254(e) should not apply at all in these circumstances because section 2244 requires a mere threshold determination that does not involve the merits of the claims, section 2254(e) makes clear that it applies in all proceedings 'instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.' A determination under section 2244, while not on the merits of the claims, falls within this language.")

In the rare instances in which § 2254(e)(2) does not apply,[22] it is the district court's discretion whether to hold an evidentiary hearing on a claim under Rule 8 of the Rules Governing

---

[22] By its own terms, § 2254(e)(2) does not apply if the petitioner was not at fault for "fail[ing] to develop the factual basis of a claim in state court proceedings[.]" In *Shinn*, the Supreme Court held that under AEDPA and its precedents, any ineffective assistance by state postconviction counsel in developing the state-court record is attributed to the prisoner for the purposes of § 2254(e)(2). 596 U.S. at 382.

Additionally, in *Cristin v. Brennan*, 281 F.3d 404, 413 (3d Cir. 2002) the Court of Appeals concluded "that the plaining meaning of § 2254(e)(2)'s introductory language does not preclude federal hearings on excuses for procedural default at the state level." 281 F.3d at 413. The Court of Appeals' conclusion was based on two reasons. First, that a hearing used to support an excuse for procedural default is not a hearing on "a claim" under AEDPA because it is not a claim for relief on the merits. *Id.* at 417-18. Second, that a state prisoner "cannot be faulted…for not having previously presented the facts underlying arguments that would have been, on the whole, irrelevant or premature before state courts." *Id.* at 417.

More recently, however, the Court of Appeals explained that the Supreme Court's decision in *Shinn* in 2022 "suggests that '[t]here is good reasons to doubt' our reading of the word 'claim' in *Cristin*, [but] it [did] not abrogate [*Cristin's*] holding that, generally, AEDPA's text does not forbid federal courts from developing the facts needed to excuse a procedural default." *Williams v. Sup't Mahanoy SCI*, 45 F.4th 713, 723 (3d Cir. 2022). But *Shinn* does limit *Cristin's* reach. *Shinn* makes clear that, when a prisoner is at fault for failing to develop the record needed to support a constitutional claim on the merits in state court and cannot satisfy § 2254(e)(2)'s exceptions, federal courts may not consider evidence first gathered during a hearing on whether the petitioner can overcome the default of a claim allowed by *Cristin* to decide the constitutional *Footnote continue on next page…*

29

Section 2254 Cases in the United States District Courts. *See, e.g.*, *Schriro v. Landrigan*, 550 U.S. 465, 473-75 (2007).

Turning now to Burton's remaining *Napue* claims, he maintains that he has satisfied § 2244(b)(2)(B)(ii)'s demanding standard because "no reasonable factfinder would've convicted him" if they knew "about Melvin Goodwine's credible confessions, [Brian] O'Toole's credible admission, and Marvin Harper's credible affidavit." (ECF 15 at 10.) This argument is not persuasive. The PCRA court found that neither Goodwine's confessions nor O'Toole alleged admission were credible or reliable. Burton provides extensive argument as to why he contends the PCRA court erred, but he fails to establish by the required "clear and convincing evidence" that the PCRA court was wrong. Thus, he has not overcome the presumption of correctness this Court must give to the PCRA court's factual determinations under § 2254(e)(1). Accordingly, this Court is bound by those determinations.[23]

Moreover, the only evidence that was introduced into the record regarding O'Toole's alleged admission was the testimony given by Burton's investigator, Zachary Stern, at the

---

claim on the merits. *Shinn*, 596 U.S. at 388-89. To avoid prolonging federal habeas proceedings, *Shinn* also instructs that in these cases, federal courts must skip hearings altogether and deny habeas relief unless the prisoner prevails on the merits considering only the state court record. *Id.* at 388-90.

Here, the Court does not reach the issue of whether Burton can overcome the default of his claims because he has not satisfied the requirements of § 2244(b)(2)(B)(ii) and therefore the Court must dismiss his claims for that reason. But if the Court could reach that issue, the Court likely would not need to decide whether he can overcome his default of his *Napue* claims because the closed state court record does not support them and they could be denied for that reason.

[23] To bolster the credibility of Goodwine's confessions, Burton proffers one new document that discusses generally the processes of Pennsylvania parole proceedings. (ECF 41-2.) This document was not introduced into the state court evidentiary record, and Burton does not state that it contains information that was unavailable to him during the PCRA proceeding. In any event, even this document could be introduced into the evidentiary record, it does not amount to clear and convincing evidence that the PCRA court's factual determinations regarding Goodwine's confessions were wrong or that Burton is actually innocent, even when considered together with the other evidence that was introduced into the record.

February 14, 2018 PCRA hearing, which is quoted above. (PCRA Hr'g Tr., 2/14/18, ECF 1-2 at 298-99.) Stern gave no testimony that would support a finding by this Court that at the 1993 trial the prosecution knowingly solicited false testimony or knowingly allowed it to go uncorrected when it appeared, which is necessary to establish a due process violation under *Napue*. Nor did Stern give any testimony to show, by clear and convincing evidence, that but for the alleged *Napue* violation no reasonable factfinder would have found Burton guilty.

Finally, as the Court has pointed out, the 2014 affidavit purportedly by the Marvin Harper who testified at the 1993 trial was not introduced into the evidentiary record during the state court proceeding. Burton did not request a hearing before this Court, let alone show that this Court would not be prohibited from having one under § 2254(e)(2). In any event, if an evidentiary hearing is not barred by § 2254(e)(2), Burton has not shown why this Court, in an exercise of its discretion, should have one. During the PCRA proceeding, Burton conducted discovery on the *Napue* allegations he made in his Harper claims and had the opportunity to introduce evidence, if it existed, to support his *Napue* allegations. He submitted none. Thus, if this Court were not prohibited under § 2254(e)(2) from holding an evidentiary hearing, this Court would, in an exercise of its discretion, determine that there was no basis to have one.

## III.    Conclusion

Based on the above, the Court will dismiss each claim in the Amended Petition because Burton has failed to satisfy the requirements of § 2244(b)(2)(B)(ii).

AEDPA codified standards governing the issuance of a certificate of appealability for appellate review of a district court's disposition of a habeas petition. It provides that "[u]nless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from…the final order in a habeas corpus proceeding in which the detention complained

of arises out of process issued by a State court[.]" 28 U.S.C. § 2253(c)(1)(A). It also provides that "[a] certificate of appealability may issue...only if the applicant has made a substantial showing of the denial of a constitutional right." *Id.* § 2253(c)(2).

"When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a [certificate of appealability] should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). When the district court has rejected a constitutional claim on its merits, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable wrong." *Id.*

Applying those standards here, jurists of reason would not find it debatable whether each of Burton's claims should be dismissed for the reasons given herein. Accordingly, the Court will not issue a certificate of appealability on any of Burton's grounds for relief.

An appropriate Order follows.


Date: May 29, 2026                              /s/ Patricia L. Dodge
                                                PATRICIA L. DODGE
                                                UNITED STATES MAGISTRATE JUDGE


32